✓ FILED          ENTERED

_____ LOGGED _____ RECEIVED

4:40 pm, Jun 02 2021

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**1214 Rutledge PL, APT 1D**<br>**Frederick, MD 21703** | 21-1404 BPG<br><br>Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Robert Van Etten, a Special Agent with the U.S. Department of State Diplomatic Security Service (DSS), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1214 Rutledge PL, APT 1D, Frederick, MD 21703, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the U.S. Department of State Diplomatic Security Service and have been since May 2010.  From May 2010 through November 2010, I attended the Criminal Investigator Training Program in Glynco, GA at the Federal Law Enforcement Training Center.  During that time, I also attended the DSS Basic Special Agent Course which included training in passport and visa fraud violations. During my employment with the DSS, I have participated in investigations involving passport and visa fraud.  I am currently assigned to the Washington Field Office.

3.      As a DSS Special Agent, I routinely investigate cases of fraudulently obtained passports, impostors, fraudulent identity documents, and passport fraud in the jurisdiction of the Washington Field Office (Maryland, Virginia, District of Columbia, Delaware, and West Virginia).  Based on my knowledge, training, and experience, a common occurrence in passport fraud cases is the presence of false identity documents to assist in the procurement of United States passports.  In my experience, persons using fraudulent identity documents to obtain fraudulent passports often possess fraudulent documents, the means of fabrication, money, and records of payment associated with the sale of fraudulent documents in their home.

4.      During my tenure as a federal law enforcement officer in Washington, D.C. and the surrounding areas I have taken part in numerous federal investigations involving passport fraud, fraud and misuse of visas and passports, and aggravated identity theft.

5.      During the course of my experience as a Special Agent, I have had the opportunity to interview numerous defendants, victims, witnesses, and confidential informants, and other agents regarding passport fraud, fraud and misuse of visas and passports documents, and identity theft within the jurisdiction of the Washington Field Office.  I have learned that suspects who apply for passports using the identity of other individuals usually have possession of and keep false identification documents related to the false identity used for the passport applications, including but not limited to social security cards, driver's licenses, and identification cards.

6.      Lastly, I have learned and experienced that suspects do not always carry the false primary identity documents on their person, but will keep these documents in their residence for

future use. I have also learned that illegal aliens who assume false identities in order to procure

U.S. travel documents to allow them to occasionally return to their home countries maintain

communications with friends and relatives under their actual identities, and that these

communications as well as other indicia of their true identities may be found in their electronic

and written communications stored electronically and in paper form in their residences.

7.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on my training, experience, and the facts as set forth in this affidavit, there

is probable cause to believe that violations of Aggravated Identity Theft in violation of 18 U.S.C

§ 1028A; Passport Fraud in violation of 18 U.S.C. § 1542, False Claim of United States

Citizenship in violation of 18 U.S.C. § 911, and Social Security Number Fraud, in violation of 42

U.S.C. § 408(a)(7)(B) (collectively referred to as the "TARGET OFFENSES") have been

committed by BALBOA.  Based on my training and experience, my knowledge of this

investigation and the longevity of the scheme detailed in this affidavit, there is probable cause to

search the TARGET RESIDENCE for evidence, instrumentalities, and fruits of the TARGET

OFFENSES, as further described in Attachment B.

## PROBABLE CAUSE

9.      My investigation has determined that on March 16, 2019, an individual who

identified himself as Hugo Dante Balboa (hereafter "HDB") appeared at the U.S. Post Office

located at 201 E Patrick St. in Frederick, MD, where he represented himself to be a United States

citizen born in Texas in 1968.  HDB used Balboa's identity documents and personally

identifiable information to complete a Department of State Form 11 (DS-11), Application for a U.S. Passport in BALBOA's name.  On the DS-11, HDB listed balboahugo555@gmail.com as his contact email address.

10.     The U.S. Post Office is an authorized Department of State acceptance agent for passport applications.

11.      HDB signed the passport application at the postal facility on that same day, March 16, 2019, after being administered an oath by the acceptance clerk, during which HDB swore that the statements made on the passport application were true and correct and that the photograph attached to the application was a true likeness of him.

12.     On March 22, 2019, the Washington Passport Agency (WPA) received HDB's DS-11 and on March 27, 2019, this application was referred to the Fraud Prevention Managers (FPMs) office.  WPA subsequently referred the case to DSS' Washington Field Office for further investigation.

13.     DS Agents reviewed scanned copies of the passport application, the state identification card, and the birth certificate submitted in furtherance of the application, which were digitally archived by the Department of State.  They noted that on HDB's DS-11 application, he listed his name as Hugo Dante Balboa, his date of birth as July 24, 1967, his social security number as 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, and his address as 1214 Rutledge PL, APT 1D, Frederick, Maryland 21703.  For proof of citizenship in his passport application, HDB had provided a state of Texas birth certificate in the name of Hugo Dante Balboa, originally filed on December 11, 1968, and issued on January 13, 2014.  For proof of identity, he presented a

Maryland Identification card bearing the number B410319135582 issued on January 24, 2019 in the name of Hugo Dante Balboa.  The address listed on MD ID B410319135582 is 1214 Rutledge PL, APT 1D, Frederick, MD 21703.  The application listed the applicant's place of birth as "Cameron Browsville" (sp.).

14.     Database checks conducted by this DS suggested that as many as three individuals residing in Maryland, Florida, and Texas shared the same biographic data (Balboa, Hugo; DOB: 07/24/1967, SSN# 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).  Requests were submitted to the TX, MD and FL fusion centers to attain Department of Motor Vehicle images of the subjects from the three states.  I observed the photos of the individuals in the returned IDs from MD, FL, and TX.  The individual(s) in the MD and FL ID's look like the same person.  However, the individual in the TX ID does not look like the individual(s) in the MD and FL IDs.   The photo on HDB's DS-11 passport application matches the photos from the MD and FL IDs.  The photo on the Texas ID, subsequently determined to be the true Hugo Balboa, does not match the photo on the DS-11 or MD and FL IDs.

15.     DS Agents interviewed the Hugo Dante Balboa residing in Texas in October 2019.  They were able to confirm that he was the actual Balboa and he did not apply for a passport in Frederick, Maryland in March 2019.  Agents were able to conclude that the 2019 passport application was executed by an impostor.  DS Agents showed the actual Balboa HDB's DS-11 and asked Balboa about the information on the DS-11 line by line. On page 1, Balboa stated the name, date of birth, place of birth and social security number were all his. He didn't recognize the e-mail, primary contact phone number or address. The actual Balboa stated the photo and signature were not his.

5

16.    DS Agents also interviewed Graciela Castro, Balboa's sister, in October 2019. DS Agents showed Castro was a photo lineup containing six photos. Three photos were of two different people using the Hugo Balboa identity. Castro identified two of the photos as her brother, Hugo Dante Balboa. She didn't recognize the other photos, including HDB. DS Agents showed Castro DS-11# 192785428 and after looking at the photo on the DS-11, Castro stated the person in the photo was not her brother.

17.    HDB appears to have sustained multiple convictions in Florida prior to moving to Maryland, including a federal felon in possession conviction from the Middle District of Florida in 2009, for which he was sentenced to 70 months' imprisonment.  HDB was disqualified from possessing a firearm due to multiple state convictions, including First Degree Battery convictions in both 1995 and 1996, resisting arrest/obstructing law enforcement with violence in 1997, Second Degree Burglary and Aggravated Assault with a deadly weapon in 1999, and two convictions in 2004 for battery, including one against a law enforcement officer.  Notably for someone with so many law enforcement contacts, HDB had no criminal record before 1995, at which time he was ostensibly 28 years old.

18.    On October 22nd, 2020, SA Van Etten spoke with the leasing office for The Grove at Alban, the apartment complex that HDB lives in.  The leasing office receptionist stated that HDB and his spouse are listed on the lease.

19.    On January 22nd, 2021, SA Van Etten spoke on the telephone and exchanged emails with HDB's probation officer.   HDB is on probation and under the supervision of the Department of Public Safety and Correctional Services, Parole and Probation - West Region -

Frederick Field Office.  The address provided by HDB on his intake sheet is 1214 Rutledge PL, APT 1D, Frederick, MD 21703.  The probation officer stated that home visits have been conducted there by agents and police officers.

## **TECHNICAL TERMS**

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include cellular telephones, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

21. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer hard drive, a cellular telephone's flash memory, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

22. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

8

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a

digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

24.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

13

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the

form of documents and files that can be easily viewed on site.  Analyzing

evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises

could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence.  Storage media can store a large

volume of information.  Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and

would be impractical and invasive to attempt on-site.

    b.  Technical requirements.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site.  The vast array of computer hardware

and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled

environment will allow its examination with the proper tools and knowledge.

14

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

25.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

26.      Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

27.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

21-1404 BPG

Respectfully submitted,

*Robert Van Etten*

Robert Van Etten
Special Agent
Diplomatic Security Service

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with

Fed. R. Crim. P. 4.1 and 41(d)(3) this __7th__ day of May 2021.

Beth P. Gesner
United States Chief Magistrate Judge

16

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is 1214 Rutledge PL, APT 1D, Frederick, MD 21703, further described as a three-story multi-unit apartment building with a red brick façade.   There is an elevated staircase leading from the parking lot to the entry.    The numbers 1214 are located just above the entry on an overhang.  The front entry is open air, allowing access to a main stairwell. There is a corridor at the main entry that leads to the rear of the building, allowing access to the opposite side.

Front of Apartment Building



Front Door to Apartment



21-1404 BPG

# **ATTACHMENT B**

*Property to be seized*

1.      All records relating to violations of 18 U.S.C. §1542, Passport Application Fraud, 18 U.S.C. § 1028A, Aggravated Identity Theft, 18 U.S.C. § 911, False Claim of United States Citizenship, and 42 U.S.C. § 408(a)(7)(B), Social Security Number Fraud, those violations involving HDB,  including:

   a.   Any and all documents, applications, records, mail address and/or telephone notebooks, correspondence, books, receipts, notes, ledgers, and other papers and objects, including any computerized or electronic records, constituting or relating to any passport, visa, birth certificate, social security card, driver's license, marriage license, credit card, access device, passport photograph or similar photography, government identification card, or any other document that alone or in combination with others, may be used for identification or evidence of identity, including any records, relating to said items;

   b.   Records and information relating to the e-mail account BALBOAHUGO555@GMAIL.COM;

   c.   Records and information relating to the actual identity, nationality, origin or location of the suspect;

d.  Records and information relating to Department of Homeland Security or the Immigration and Naturalization Service or that have been received from, or sent to, said agencies;

e.  Records and information, including any computerized or electronic records, that refer or relate to fraudulent birth certificate and identification documents;

f.  Any and all documents, records and objects, including computerized and electronic records, evidencing or relating to travel, domestic or international;

g.  Any and all documents, photographs, letters, correspondence, and other objects, including computerized and electronic records relating to, or evidence of true or false identity;

h.  Any and all passports and documents, including computerized or electronic, that refer or relate to the obtaining or using of any passport;

i.  Any and all records reflecting indicia of occupancy, residency, and/or ownership of the premises, including, but not limited to utility and telephone bills; lease, mortgage, deed, lien records; U.S. Mail, including Express Mail, and other courier services;

j.  Any and all records that refer or relate to HDB's employment;

k.  Cellular telephones, computers, computer hardware, software, related documentation, computer passwords and data security services, external storage

2

devices (including, but not limited to, jump drives, thumb drives, CD's, and
DVD's that may contain any of the items listed in paragraphs a-j above)

2.      Computers or storage media used as a means to commit the violations described
above.

3.      For any computer or storage medium whose seizure is otherwise authorized by
this warrant, and any computer or storage medium, including "smart" cellular telephones, that
contains or in which is stored records or information that is otherwise called for by this warrant
(hereinafter, "COMPUTER"):

  a.   evidence of who used, owned, or controlled the COMPUTER at the time the
       things described in this warrant were created, edited, or deleted, such as logs,
       registry entries, configuration files, saved usernames and passwords, documents,
       browsing history, user profiles, email, email contacts, "chat," instant messaging
       logs, photographs, and correspondence;

  b.   evidence of software that would allow others to control the COMPUTER, such as
       viruses, Trojan horses, and other forms of malicious software, as well as evidence
       of the presence or absence of security software designed to detect malicious
       software;

  c.   evidence of the lack of such malicious software;

3

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

4

web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any

5

form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1.      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2.      "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3.      "scanning" storage areas to discover and possible recover recently deleted files;

4.      "scanning" storage areas for deliberately hidden files; or

5.      performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6.      If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.